# United States Court of Appeals
## For the First Circuit

Nos. 11-1887, 11-1928

ELAINE JOYCE,

Plaintiff, Appellant/Cross-Appellee,

v.

TOWN OF DENNIS, ET AL.,

Defendants, Appellees/Cross-Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS.
[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before
Howard, Ripple,[*] and Lipez,
Circuit Judges.

Laura R. Studen, with whom Lawrence P. Murray, Jack S. Gearan, and Burns & Levinson LLP were on brief, for appellant/cross-appellee.

Leonard H. Kesten, with whom Deidre Brennan Regan and Brody, Hardoon, Perkins & Kesten, LLP were on brief, for appellees/cross-appellants.

Jonathan J. Margolis, Rodgers, Powers & Schwartz LLP, Ellen J. Messing, James S. Weliky, and Messing, Rudavsky & Weliky, P.C. on brief for amicus curiae Massachusetts Employment Lawyers Association.

Anne L. Josephson, Kotin, Crabtree & Strong, LLP, Sarah Wunsch, and ACLU of Massachusetts on brief for amici curiae American Civil Liberties Union of Massachusetts, Gay & Lesbian Advocates & Defenders, the Jewish Alliance for Law and Social

---

[*]Of the Seventh Circuit, sitting by designation.

Action, the Lawyers' Committee for Civil Rights and Economic Justice, Massachusetts Law Reform Institute, and the National Police Accountability Project.

_____

June 17, 2013

_____

**LIPEZ, Circuit Judge**.  In May 2007, three days before plaintiff Elaine Joyce ("Joyce") expected to play golf with her father in a tournament at a town course in Dennis, Massachusetts, Joyce's father was told he would have to find another partner because women were not allowed in that "men's" tournament.  The Town Administrator declined to reverse the course officials' decision, and Joyce subsequently brought federal and state claims alleging gender discrimination against the Town, the golf course, and several individuals.  The district court granted summary judgment in her favor and thereafter held a trial on damages.  This appeal addresses only the nature and extent of her remedy.  Joyce claims that the district court erred in refusing to instruct the jury on punitive damages, denying injunctive relief, and awarding attorney's fees in an amount substantially less than her request.  The defendants claim that the court erred in concluding that Joyce was a prevailing party entitled to any attorney's fees.

We find no error in the court's treatment of punitive damages, but must remand for further proceedings on injunctive relief and attorney's fees.  We reject the defendants' contention that the court should not have awarded any attorney's fees and instead conclude that the court erred in reducing the requested award based on, inter alia, Joyce's rejection of a settlement offer.  The district court also must revisit the issue of

injunctive relief and explain its decision to grant or refuse such relief.

## I.

We recount in some detail the circumstances underlying Joyce's complaint of gender discrimination, as well as the procedural history of the case. Although appellees do not challenge the district court's finding of liability, the court's rulings on punitive damages, injunctive relief, and attorney's fees must be reviewed in the context of the litigation as a whole.

## A. The Events at Dennis Pines

Elaine Joyce is an avid and proficient golfer who signed up with her father in April 2007 to play in a tournament at the Dennis Pines Golf Course the first weekend in May.[1] The tournament was listed on the course schedule as a men's members-only event. Both Joyce and her father, Patrick, are members of the course and, in the fall of 2006, had been assigned a tee time for a similar tournament that was rained out.[2]

On May 2, 2007 -- three days before the start of the tournament -- the Town's head golf pro, Russell Champoux, called Patrick Joyce and told him that the Golf Advisory Committee

---

[1] Dennis Pines is one of two public golf courses in the Town of Dennis.

[2] Joyce testified about the 2006 event, but there is no documentary evidence of either the Joyces' registration or the circumstances of the tournament's cancellation.

-4-

("GAC"), a volunteer group responsible for course policy, had decided that his daughter could not play in the Dennis Pines men's tournament because of her gender. Joyce was never contacted directly by Dennis Pines, but after her father relayed the news to her, she sent an email to the Town Administrator, Robert Canevazzi, seeking his help "to make certain that this discriminatory practice is not condoned by the Town of Dennis or any of its committees." In her message, sent early on May 3, Joyce asked Canevazzi to "act promptly to get the current decision reversed" so that she could play in the weekend tournament. Joyce contacted Canevazzi because she had had a similar experience at a golf course in another town. After a prolonged effort to persuade club officials in that town to allow her to join a men's league, she was finally able to secure a policy change through the town administrator.

Canevazzi replied to Joyce later the same day. He reported that he had spoken to Champoux and members of the GAC, and he had decided to uphold Joyce's exclusion from the tournament because changing the rules so late "would not be fair to the 1600 plus members of the Dennis Golf Courses who may either desire or not desire to play in such a tournament." In addition, he noted that the Tournament Committee (a subcommittee of the GAC) had sought to schedule more women's tournaments "to allow greater opportunities for women to have such competitive events." He stated that he did not view the club's tournament policies to be

discriminatory, but nonetheless had asked the chairman of the GAC to include discussion of the criteria for tournament participation at its May 14 meeting. Canevazzi did not expressly invite Joyce to attend that meeting, but he told her its time and location.

The GAC's chairman, Jim Horvath, sent Joyce an email on May 4, in which he apologized for "any confusion and inconvenience that you encountered in how you learned about your non-participation in this weekend's golf event." He explained that the GAC had voted in December to approve the schedule of tournaments set up by the Tournament Committee and the head golf professional. He wrote that, "[t]o me, it was clear then that there were balanced opportunities for both men and women to play in the first 3 events of this year," and noted, "I think that is still the case."[3] He continued:

> As chairman of the GAC, I welcome open discussion on this matter and have placed it on the May 14 Golf Advisory Committee agenda (as Bob Canevazzi indicated to you yesterday). The meeting is at 5pm at Dennis Highlands. I hope that you can attend. Please don't hesitate to contact me in the interim.

---

[3] Dennis Pines' 2007 schedule listed five men's-only tournaments and two women's-only tournaments, for a total of ten men's-only tournament days and two women's-only tournament days. In addition, there were seven tournaments in which both men and women were scheduled to play in separate divisions, for a total of thirteen days (twelve for women). At least one of the tournaments included a mixed gender division, in which men and women played together on teams.

-6-

Horvath then thanked Joyce "for bringing this issue to our attention."

Joyce did not contact Horvath or attend the May 14 meeting. At that meeting, the GAC voted to ask the Tournament Committee to make a recommendation on the gender-based tournament policy and report back to the GAC "as soon as possible." At its next meeting, on June 11, the GAC accepted the Tournament Committee's recommendation that no changes be made to the 2007 schedule and that, beginning in 2008, every tournament would have a women's field.[4] Creating separate divisions was consistent with the opinion of Town Counsel as reported by Canevazzi at the meeting. According to Canevazzi, counsel had expressed "alarm[]" that the course policy "could be perceived as discriminatory" and stated that "it must be made more gender-neutral offering more women['s] divisions within the Tournaments." But Champoux, the club pro, observed at the meeting that the change would not resolve Joyce's complaint, which stemmed from her desire to play with the men -- and not in a parallel division for women. At the GAC's July meeting, the "Gender Based Policy" issue was tabled because "no additional information ha[d] been received."

---

[4] The meeting minutes indicate that the Tournament Committee at that time had an equal number of men and women. Horvath testified in 2011 that it had seven members, four of whom were women.

**B. The Administrative Complaint and Aftermath**

Frustrated by the response to her concerns, Joyce filed a pro se complaint in July 2007 with the Massachusetts Commission Against Discrimination ("MCAD") against the Town of Dennis and Canevazzi. After the filing, an attorney representing the Town, Kristin Harris, called Joyce twice and left messages asking her to call to discuss the dispute. Joyce did not respond. She also did not respond to a letter Harris sent her referencing the MCAD's mediation process, though Joyce asked the Commission if she was obliged to talk to the Town and was advised to wait until the Town filed its position statement.[5]

The GAC again acted on the gender policy at its October 2007 meeting. After Horvath reported that the United States Golfing Association ("USGA") allows women to play in all events "as long as they play exactly the same as a man," the GAC voted unanimously to instruct the Tournament Committee to follow the USGA rules for all 2008 tournaments. This was the tournament policy that Joyce originally had sought, allowing women to play alongside men.[6] Although no general announcement of the change in policy was

---

[5] Canevazzi testified that after receiving the MCAD complaint he instructed the Town's attorney to try to schedule mediation, which he understood to be the MCAD's recommendation.

[6] Joyce asserts that no change in policy in fact was adopted in October 2007, but the record does not support that contention. We agree with the district court that the record, consisting of deposition and trial testimony and exhibits, can only reasonably be read to show that the GAC at its October 22 meeting "formally

-8-

communicated to members,[7] the 2008 Tournament Information Packet included a statement (which did not appear in the 2007 Packet) advising that "[a]ll tournaments will follow USGA guidelines for participation."[8]  Canevazzi acknowledged that he would not have understood from that statement that a change in gender policy had occurred, although -- in another revision of the 2007 Packet -- the 2008 tournament schedule eliminated the gender labels in the listings of members-only tournaments.

The Town filed its MCAD position statement on November 2, 2007, without mentioning the October vote.  Canevazzi, who signed the document, testified that the statement had been prepared weeks earlier, and he had failed to realize that it did not reflect the October meeting when he signed it.  The MCAD statement denied that the facts showed "discrimination of any kind," and noted that "once

---

agreed to allow women to play in men's tournaments, as Joyce had originally requested."  Joyce v. Town of Dennis, 705 F. Supp. 2d 74, 79 (D. Mass. 2010); see also Joyce v. Town of Dennis, 802 F. Supp. 2d 285, 290 (D. Mass. 2011) (noting that defendants changed the tournament policy before Joyce filed her complaint).

[7] Eric Oman, GAC chair in October 2007, testified about an email announcement sent by the assistant director of golf in April 2008 to some members of the Town's golf clubs "restat[ing] the change in policy adopted by the Town of Dennis golf courses on October 22, 2007."  The announcement stated that "[a]ll men's golf tournaments are open to women competitors."  Joyce testified that the announcement also was posted on the "men's bulletin board" and, at least as of 2009, on "the website" -- which we presume to mean the Dennis Golf website.  See http://www.dennisgolf.com/guidelines.php.

[8] The statement was added, in bold type, at the top of a list of "General Tournament Information."

-9-

the Complainant's concern was brought to the Respondents' attention, the Respondents[] immediately evaluated the tournament schedule with the Golf Advisory Committee and agreed to modify the schedule, such that all tournaments would include a men's and women's division beginning in 2008."

Joyce then hired an attorney, who filed a rebuttal to the defendants' statement in early January 2008. After receiving the rebuttal, Harris, the Town's attorney, placed a call to Joyce's attorney and left a message requesting an opportunity to discuss the matter. Joyce's attorney later reported that she was unaware of that message.

## C. The Litigation

On February 15, 2008, Joyce filed a complaint in federal court against the Town, its golf courses, Canevazzi, and three course professionals,[9] alleging, inter alia, gender discrimination under federal and state law.[10] A media relations consultant hired by Joyce's counsel notified the news media of the lawsuit, which was filed on the Friday before a three-day holiday weekend. The suit quickly generated national publicity, including an article in The New York Times on February 19. See Marcia Chambers, Barred

---

[9] The three were Dennis Penner, Golf Director during part of 2007; Michael Cummings, the Head Golf Course Superintendent at the time the complaint was filed; and Champoux, the Head Golf Professional.

[10] By this time, Joyce had withdrawn her MCAD complaint.

-10-

From Men's-Only Event, Woman Sues Public Golf Club, http://www.nytimes.com/2008/02/19/sports/golf/19links.html?_r=0. The article reported that neither Canevazzi nor Harris returned the reporter's phone calls on February 18, which was the Presidents' Day holiday.[11]

A few days later, an attorney for the Town called Joyce's attorney and noted that, as a result of the GAC vote the previous October, Joyce could play golf at Dennis Pines whenever and with whomever she chose. In a follow-up letter in mid-March, defense counsel suggested trying "to resolve this matter in the best interests of our clients" and stated that the Town was "prepared to notify all members explicitly that women are welcome to play in all events, as long as they play from the same tees as the other competitors and have their handicaps adjusted accordingly." The letter solicited reaction from Joyce and her attorney on the Town's proposals. Defense counsel also pledged to investigate Joyce's allegation that she had been intimidated by "defendants and other male members" when playing at Dennis Pines after lodging her MCAD complaint, stating that "[m]y clients and I want to ensure that Ms. Joyce has a pleasant experience participating in all golfing events

---

[11] Oman, by then the GAC Chair, testified that he learned about the lawsuit from "phone messages left at [his] place of business from various TV stations, newspapers, talk-show hosts throughout the country regarding wanting statements about the pending lawsuit."

in the Town of Dennis."  Joyce's counsel's lengthy response, dated

March 31, concluded as follows:

> [N]either Ms. Joyce nor the Club membership
> has received a clear and unequivocal statement
> against gender discrimination, and the
> affirmative duty is upon the Defendants to
> propose a plan that addresses the issues that
> will otherwise be sought in a court ordered
> permanent injunction.  Be assured that Ms.
> Joyce intends to pursue her damages, including
> punitive damages.  If the Defendants wish to
> make a settlement proposal at this juncture it
> may be prudent given that the attorneys' fees
> continue to escalate, and these are also
> recoverable by Ms. Joyce.  Once we have
> received your answer, I would like to schedule
> depositions.

Defendants filed their answer to the complaint on May 28,

2008, and the litigation proceeded.

**D.  The District Court's Decision on the Merits**

In March 2010, the district court granted summary

judgment for Joyce against the Town and its golf courses on her

federal equal protection claim, brought under 42 U.S.C. § 1983, but

granted judgment for the individual defendants on that claim.

Joyce v. Town of Dennis, 705 F. Supp. 2d 74, 81 (D. Mass. 2010).

The court noted that the tournament policy excluding women from

certain events expressly discriminated based on gender, and thereby

established a suspect classification that required justification.

The defendants did not meet that requirement, the court held,

having attempted to do so with a single "conclusory statement":

"[T]he defendants offer that the justification for the men's only

tournaments is the existence itself of equal opportunity for women golfers in terms of the women's only tournaments and the mixed gender tournaments."  Id. at 80 (internal quotation mark omitted). The court further stated:

> Indeed, [defendants' statement] is not a justification at all but a reiteration of the question already answered (i.e., whether the treatment of women was unequal) . . . . Nor, for that matter, is an exceedingly persuasive justification as obvious with respect to the game of golf as opposed to football or some other contact sport.  In any event, the burden lies with the defendants, not the Court, and they have not met it here.

Id.  The court emphasized, however, that "the holding in this case results from defendants' failure to advance a persuasive justification for their acts, not necessarily because no such justification exists."  Id. at 82.

The court thus took pains to limit its finding of unlawful discrimination under federal law.  Following the statement above, the court continued as follows in a footnote:

> To that end, the Court carefully limits its holding to the circumstances of this case. What is critical here is that the burden lies with the defendants to justify their conduct and they have not done so.  This decision does not require all public golf courses to have all mixed-gender tournaments.  Instead, it establishes that when the defendants draw a clear distinction based upon gender and their only explanation is to deny that any distinction existed, they will not prevail.

Id. at 82 n.1.

-13-

The court also ruled for Joyce against all defendants on her state law gender discrimination claim, see Mass. Gen. Laws Ann. ch. 272, §§ 92A, 98,[12] and granted judgment for the defendants on a state law consumer protection claim, see Mass. Gen. Laws ch. 93A. The court reached three significant conclusions about Massachusetts public accommodations law: (1) there is no "'separate but equal' exception to the statute's otherwise clear prohibition of gender distinctions or discrimination," 705 F. Supp. 2d at 84, and, hence, (2) the plaintiff does not bear the burden to show differential treatment; and (3) a tournament at a public golf course is a public accommodations. Id.[13]

---

[12] Section 98 prohibits "any distinction, discrimination or restriction" on account of gender in "any place of public accommodation, resort or amusement," and further states, in part:

> All persons shall have the right to the full and equal accommodations, advantages, facilities and privileges of any place of public accommodation . . . subject only to the conditions and limitations established by law and applicable to all persons.

Section 92A defines "[a] place of public accommodation" to include "any place . . . which is open to and accepts or solicits the patronage of the general public."

[13] Technically, in rejecting the defendants' argument that the May 2007 tournament was a "non-public enclave" within the golf course, the court held only that the specific tournament at issue here was a public accommodation. See Joyce, 705 F. Supp. 2d at 84. Defendants' argument, however, swept more broadly. They noted that "[a] public accommodation can have a non-public enclave," and stated that "the holding of a non-public event in an otherwise public forum creates a private enclave, and takes the event out of the scope of being a place of 'public accommodation.'" Defs.' Mem. in Opp'n to Pl.'s Mot. for Partial Summ. J. and in Supp. of Defs.' Cross-Mot. for Summ. J., at 10. Defendants relied on these

The court thus held that the defendants had violated Joyce's right to equal protection under federal law when they excluded her from the men's only tournament in May 2007 and, in effect, ruled that women may not be barred from similar tournaments on the basis of gender without justification. As described above, the court also held that the defendants unlawfully discriminated against Joyce under Massachusetts law.

The court left for the jury the determination of Joyce's damages.

## E. Damages, Fees and Injunctive Relief

In January 2011, in advance of the damages trial, the district court ruled that Joyce could recover attorney's fees under both federal and state law. The court delayed setting an amount until after the damages verdict, however, because it viewed "the degree of success obtained" as "[a] major factor" in determining a reasonable fee. Joyce v. Town of Dennis, 770 F. Supp. 2d 424, 427 (D. Mass. 2011). At the same time, the court rejected Joyce's request that the jury be instructed on punitive damages. The court

principles in asserting that, because Dennis Pines did not allow the public to use the golf course during members-only tournament weekends, and tournament participants had to meet certain qualifications, "the golf tournaments thus were not a place of 'public accommodation.'" Id. at 10-11; see also id. at 11 ("[D]uring such tournaments, the golf course was not a place of public accommodation.").

Given these arguments, the court's ruling surely constitutes precedent for the general proposition that, absent some reason for an exception, tournaments at public golf courses are public accommodations.

explained that an instruction on punitive damages "would be inappropriate because there is no evidence of 'evil motive or intent' or awareness of a risk that the [golf course] rules were in violation of federal law." Id. at 428.

In February 2011, the defendants offered Joyce a settlement of $35,001, inclusive of costs and attorney's fees. She did not respond, and a jury subsequently awarded her $15,000 in compensatory damages.[14] Following the verdict, Joyce requested more than $170,000 in attorney's fees and costs under state law, see Mass. Gen. Laws Ann. ch. 151B, § 9, as well as an injunction ordering the defendants, inter alia, to adopt a policy barring gender-based discrimination. In a ruling issued on June 30, 2011, the district court awarded $30,000 in attorney's fees, and $4,600 in costs. The court denied injunctive relief.

On attorney's fees, the district court endorsed the defendants' contention that any award of fees would be unjust in the circumstances of the case, but it nonetheless concluded that Joyce was entitled to "modest" fees as the prevailing party. Joyce v. Town of Dennis, 802 F. Supp. 2d 285, 288 (D. Mass. 2011). Among the factors cited by the court to support the sharply reduced award was the rejection of what the court considered a reasonable settlement offer. Although the court acknowledged that the

---

[14] After both sides presented their evidence, the court declined to change its ruling on punitive damages.

defendants shared the blame for prolonging the case, it considered Joyce and her counsel as primarily responsible for the length of the proceedings. The court thus found it "fair and reasonable" to substantially reduce plaintiff's requested fee award. Id. at 291.

On appeal, Joyce challenges the district court's attorney's fee award and also claims error in the court's handling of punitive damages and injunctive relief.[15] The defendants filed a cross-appeal asserting that the court erred in awarding any attorney's fees.

## II.

Joyce argues that the district court improperly refused to give a punitive damages instruction. We review de novo whether the evidence was sufficient to warrant such an instruction. See McDonough v. City of Quincy, 452 F.3d 8, 23 (1st Cir. 2006).

Under Massachusetts law, punitive damages may be awarded in the context of a discrimination claim "only where the defendant's conduct is outrageous or egregious." Haddad v. Wal-Mart Stores, Inc., 914 N.E.2d 59, 75 (Mass. 2009); see also Mass. Gen. Laws Ann. ch. 151B, § 9 (stating the availability of punitive damages for discrimination claims).[16] Such an award "requires a

---

[15] Although this appeal is brought by the Town, the golf courses, and the individual defendants, we at times refer to "the Town" to signify all appellees.

[16] The Massachusetts public accommodation provisions have been integrated into the anti-discrimination scheme governed by chapter 151B, and the same remedial provisions apply. See Currier v. Nat'l

-17-

heightened finding beyond mere liability and also beyond a knowing violation of the statute." Haddad, 914 N.E.2d at 75. Determining whether punitive damages are warranted requires consideration of "all of the factors surrounding the wrongful conduct," which may include whether there was "a conscious or purposeful effort to demean or diminish the class of which the plaintiff is a part," whether the defendant recklessly disregarded the likelihood of serious harm, the nature of "the defendant's conduct after learning that the initial conduct would likely cause harm," and "the actual harm to the plaintiff." Id.

In rejecting the instruction in its January 2011 pre-trial ruling, the district court observed that gender separation in sports had been upheld by federal courts, and it pointed to the policy change made by the GAC in October 2007, before the lawsuit was filed, to allow women to play with men, not only in separate divisions, but in all tournaments starting in 2008. It also cited the defendants' invitation to Joyce to participate in discussions about changing the rules. The court concluded that the defendants' "rapid and considered response to the plaintiff's complaint" foreclosed a jury finding that punitive damages were justified.

---

Bd. of Med. Exam'rs, 965 N.E.2d 829, 842 (Mass. 2012). Joyce sought punitive damages under chapter 151B, and we accordingly analyze this issue solely as a matter of state law. Indeed, the only defendant against whom Joyce prevailed on her federal claim under section 1983 was the Town, which is immune from punitive damages under federal law. See City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981).

Joyce, 770 F. Supp. 2d at 428.  As noted above, the court reaffirmed that decision after hearing the evidence presented at trial.

We detect no error in the district court's ruling.  It is of course undisputed at this point in the litigation that the defendants acted improperly.  The district court found that they unlawfully discriminated on the basis of gender when they refused to let Joyce play in the May 2007 tournament.  A jury reasonably could have concluded as well that the GAC acted indefensibly when it chose to delay implementing its newly adopted tournament policies until 2008.  Moreover, the first change that was approved -- to add women's divisions in tournaments that previously were designated for men only -- did not eliminate the gender disparity challenged by Joyce.  A jury also could condemn the defendants' failure to communicate their new gender-neutral policy to golf club members in a clear and timely way, and could infer from their grudging behavior a resistance to the change.

We must take into account, however, "all of the factors surrounding the wrongful conduct."  Haddad, 914 N.E.2d at 75.  Though the defendants did not immediately change their gender-based tournament policy, they did immediately move to reconsider it.  As a result, they took action to increase gender equality twice within six months and ultimately adopted Joyce's desired policy, months before she filed her lawsuit.  In so doing, the GAC went beyond

what Town Counsel had told Canevazzi was necessary: "offering more women['s] divisions within the Tournaments." Indeed, Joyce acknowledged in her summary judgment memorandum that the Town's obligation to allow women to play in a tournament designated as "men's only" appeared to be a question of first impression.[17] In addition, the Town made repeated efforts to communicate informally with Joyce and her attorney; each contact, however, was rebuffed.[18] Among those efforts was an attempt in March 2008, shortly after Joyce filed suit, to solicit Joyce's reaction to the Town's proposed plan to notify all golf club members that "women are welcome to play in all events, as long as they play from the same tees as the other competitors."

Viewed against the backdrop of the actions the defendants did take in response to Joyce's objection to their gender policy,

[17] Joyce also noted in her Response and Reply Brief on appeal that "this case was the first case to have directly addressed th[e] issue" of women seeking to play in a men's only tournament at a public golf course. Brief at 4; see also id. at 18 (noting that "none of the cases ever addressed the issue of the lawfulness of single sex tournaments at a public golf course").

[18] We recognize that the conflict in this case began with a communications gaffe when Champoux, the club pro, called only Joyce's father to report the decision that she could not play in the May 5 tournament. Certainly, calling only Joyce's father was objectionable behavior and disrespectful to Joyce as a member of the course. Nonetheless, the failure to notify both members of a team, where Champoux's purpose was in part to tell the elder Joyce that he could select a new partner, cannot reasonably be viewed -- in the context described above -- as sufficiently "outrageous or egregious" to support an award of punitive damages. Haddad, 914 N.E.2d at 75.

their censurable conduct cannot properly be characterized as "so offensive that it justifies punishment and not merely compensation." Id. Although the defendants arguably should have moved more quickly and more transparently to effectuate a policy change -- rather than waiting until 2008 -- they demonstrated a willingness from the outset to address Joyce's concern and conform to the law. In arguing to the contrary, Joyce relies heavily on her assertion that the GAC did not in fact vote in October 2007 to open all men's tournaments to women, a contention we have rejected based on our review of the record. See supra note 6. She also asserts that the defendants had understood for years before her objection that their tournament policy was discriminatory, citing minutes from a GAC meeting in August 2005. According to those minutes, a couple who spoke during a "Public Input" session observed that "this being 2005 it was very difficult to justify holding only 'Men's' tournaments and not including women." The husband of the couple also noted that his club in Lowell allowed women to play in any club event "as it is discriminatory to exclude women."

There is more to this story, however. Both Horvath, the GAC chair in 2005, and Oman, his successor, testified that as a result of the 2005 discussion more women's tournaments and women's divisions were added to the schedule. Until Joyce challenged the gender restriction on men's-only tournaments in 2007, there was no

other complaint.  Particularly when viewed in light of the advice the GAC later received from Town Counsel, the Committee's response in 2005 -- adding tournament opportunities for women -- could have been thought sufficient to meet the concern expressed.[19]  On this record, a jury could not reasonably conclude that the defendants' failure to open all tournaments to women following the 2005 discussion established "a conscious or purposeful effort to demean or diminish the class of which the plaintiff is a part" or any other factor justifying punitive damages.  Haddad, 914 N.E.2d at 75.

We thus find no error in the district court's refusal to instruct the jury on punitive damages.

### III.

Joyce's petition for injunctive relief asked the district court to order the defendants to take five actions: (1) issue an

---

[19] Indeed, it appears that the defendants could have understood that unequal opportunities for tournament play remained a focus even after Joyce complained.  As reported in the minutes, Joyce's father raised that concern at the GAC's meeting on May 14, 2007, when the Committee first addressed her complaint:

> Mr. Patrick Joyce, father of Elaine who had submitted the letter concerning the fact that she was not allowed to play in the men's event stated that he felt the men have far more tournaments than the women and it was not an equal mix of tournaments.

Oman, the GAC chair after Horvath, also testified that Mr. Joyce "voiced his concerns and opinions [at the meeting] that the committee should have . . . equal tournaments between men and women and more opportunities for women to play."

"affirmative directive" that play at the Dennis golf courses will be based solely on qualification and golf handicap, not gender; (2) issue a directive that, pursuant to state and federal law, "there shall be no distinction, restriction or discrimination on the basis of sex"; (3) adopt reasonable steps to insure that the golf courses "maintain[] an environment that is neither uncomfortable nor emotionally taxing for Ms. Joyce"; (4) adopt and disseminate a written policy advising golf course members that it is unlawful to, inter alia, retaliate against anyone for supporting the exercise of protected rights; and (5) conduct staff training sessions on gender discrimination, including the obligation to maintain a comfortable environment for all golfers. The district court denied the petition with little comment, stating only that the defendants had "gotten the message" and that any future conduct to the contrary would be met with severe sanctions.

In asserting that the district court erred in denying injunctive relief, Joyce emphasizes her view that the defendants had not changed the tournament rules by the time she filed her lawsuit. More fruitfully, she also complains that the court failed to perform the analysis prescribed by our precedent for assessing the need for injunctive relief. Under that four-part inquiry, injunctive relief may be ordered where (1) the plaintiff has prevailed on the merits, (2) the plaintiff would suffer irreparable injury in the absence of injunctive relief, (3) the harm to the

plaintiff would outweigh the harm to the defendants from an injunction, and (4) the injunction would not adversely affect the public interest. See Asociación de Educación Privada de P.R., Inc. v. García-Padilla, 490 F.3d 1, 8 (1st Cir. 2007).

We review denials of injunctive relief for abuse of discretion, considering any underlying legal issues de novo. Animal Welfare Inst. v. Martin, 623 F.3d 19, 26 (1st Cir. 2010). Here, the absence of explanation by the district court hampers our review. It is possible that the court concluded that injunctive relief was unnecessary because the defendants had already adopted and disseminated the policy that Joyce had demanded, giving her equal access to all tournaments for which she has the requisite skills. However, despite the change in their tournament policy in October 2007, the defendants vigorously litigated the case, raising various legal arguments in asserting that they bore no obligation to include women in men's-only tournaments. Their initial dissemination of the October 2007 action was limited and, insofar as the change was presented as an adoption of the USGA guidelines, likely inscrutable to many of Dennis Pines' members. In addition, the hostile reaction Joyce received from some male members after she filed her MCAD complaint suggests that discriminatory behaviors may remain at Dennis Pines, notwithstanding the change in tournament policy. The court's reference to the possibility of

contrary behavior in the future suggests some doubt on its part about the permanence and scope of the defendants' actions.

If the court in fact was concerned about grudging compliance with the October 2007 policy and thus perceived a risk of ongoing discrimination at the Dennis golf courses, its refusal to grant equitable relief would be less defensible because Joyce easily satisfies three of the four prerequisites for injunctive relief. She prevailed on the merits, no apparent harm would befall defendants from disseminating and following a policy that they already have adopted, and barring discrimination would plainly have no adverse impact on the public interest. Moreover, it is unclear how sanctions could be imposed in the event of future misconduct absent injunctive relief, unless Joyce or some other party filed a new lawsuit. Joyce should not bear the burden of initiating another action to protect the right to equal treatment that she won in this case.

Hence, the key issue here in assessing the need for injunctive relief is the prospect of irreparable future harm. We have stated that, "[t]o be entitled to a forward-looking remedy, a plaintiff must satisfy the basic requisites of equitable relief -- 'the likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law.'" Steir v. Girl Scouts of the USA, 383 F.3d 7, 16 (1st Cir. 2004) (quoting O'Shea v. Littleton, 414 U.S. 488, 502 (1974)); see also Lopez v. Garriga,

-25-

917 F.2d 63, 67 (1st Cir. 1990) (noting that "an injunction-seeker must show either that some past unlawful conduct has continuing impact into the future, or else he must show a likelihood of future unlawful conduct on the defendant's part" (citation omitted)). We decline to uphold the district court's rejection of injunctive relief in the absence of its considered evaluation of that factor. It should address that deficiency in its analysis by conducting on remand, on the basis of the existing record, the four-factor inquiry set out by our precedent.[20]

## IV.

Both parties challenge the district court's award of $30,000 in attorney's fees. Joyce complains that the court considered improper factors in awarding less than one-fourth of the fees that she requested, and the Town argues that the court should not have awarded any fees at all. Before addressing these contentions, we review the pertinent legal principles and the district court's rulings.

---

[20] The district court noted that Joyce's complaint did not request the specific types of injunctive relief that she later sought in her petition and instead requested "only an Order enjoining the defendants from discriminating on the basis of gender." Joyce, 802 F. Supp. 2d at 292. The defendants have cited no precedent that would bar a plaintiff from making a more specific request for equitable relief after she has prevailed on the merits.

## A. Legal Framework

Although Joyce prevailed on both federal and state discrimination claims, she sought fees only under Massachusetts law.  The applicable fee-shifting provision states:

> If the court finds for the petitioner it shall, in addition to any other relief and irrespective of the amount in controversy, award the petitioner reasonable attorney's fees and costs unless special circumstances would render such an award unjust.

Mass. Gen. Laws ch. 151B, § 9.  The amount of a reasonable fee under section 9 is "largely discretionary with the judge." Fontaine v. Ebtec Corp., 613 N.E.2d 881, 890 (Mass. 1993).  Hence, our review of the district court's award of fees under the provision is for legal error or "manifest abuse of discretion." Diaz v. Jiten Hotel Mgmt., Inc., 704 F.3d 150, 153 (1st Cir. 2012).

In evaluating reasonableness, we may consider both federal and Massachusetts precedent, as "attorney's fees available in both fora should, for the most part, be calculated in a similar manner."  Fontaine, 613 N.E.2d at 891.  The Massachusetts Supreme Judicial Court ("SJC") has adopted the "lodestar" method commonly used by federal courts, observing that "[a] fair market rate for time reasonably spent preparing and litigating a case is the basic measure of a reasonable attorney's fee under State law as well as Federal law."  Id.; see also Torres-Rivera v. O'Neill-Cancel, 524 F.3d 331, 336 (1st Cir. 2008) (describing the lodestar method of "multiplying the number of hours productively spent by a reasonable

hourly rate" as the typical starting point for calculating a fee). The calculation may be adjusted up or down to reflect a variety of factors:

> In determining the amount of a reasonable fee, we consider "the nature of the case and the issues presented, the time and labor required, the amount of damages involved, the result obtained, the experience, reputation and ability of the attorney, the usual price charged for similar services by other attorneys in the same area, and the amount of awards in similar cases."

Haddad v. Wal-Mart Stores, Inc., 920 N.E.2d 278, 281 (Mass. 2010) (Rescript) (quoting Linthicum v. Archambault, 398 N.E.2d 482, 488 (Mass. 1979), overruled in part on other grounds by Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., 640 N.E. 2d 1101, 1104-1105 (Mass. 1994));[21] see also Torres-Rivera, 524 F.3d at 336.

The United States Supreme Court has identified "results obtained" as "a preeminent consideration in the fee-adjustment process," Coutin v. Young & Rubicam P.R., Inc., 124 F.3d 331, 338 (1st Cir. 1997) (citing Hensley v. Eckerhart, 461 U.S. 424, 432, 440 (1983)), but that factor has multiple facets:

---

[21] The Massachusetts SJC has noted that the lodestar method need not be applied as "a two-step approach of lodestar and adjustments," which it described as "unnecessarily complex." Stratos v. Dep't of Pub. Welfare, 439 N.E.2d 778, 786 (Mass. 1982). As that court pointed out, some of the "adjustment[]" factors are properly subsumed within the calculation of reasonable hours and rates. Id. The SJC thus concluded that "fair market rates for time reasonably spent should be the basic measure of reasonable fees, and should govern unless there are special reasons to depart from them." Id.

> It can refer to a plaintiff's success claim by claim, or to the relief actually achieved, or to the societal importance of the right which has been vindicated, or to all of these measures in combination. We think that the last meaning is the best choice, and that, as a consequence, all three types of "results" potentially bear upon the amount of an ensuing fee award.

Id. Consistent with this broad notion of the lawsuit's outcome, Massachusetts precedent emphasizes the need to consider, inter alia, "the interests that the statute in question is designed to protect and the public interest in allowing claims under that statute to proceed with competent counsel." Haddad, 920 N.E.2d at 281. Thus, "when a plaintiff's victory, although 'de minimis as to the extent of relief[,] . . . represent[s] a significant legal conclusion serving an important public purpose,' the fee award need not be proportionate to the damages recovered." Killeen v. Westban Hotel Venture, LP., 872 N.E.2d 731, 738 (Mass. App. Ct. 2007) (alterations in original) (citation omitted) (quoting Díaz-Rivera v. Rivera-Rodríguez, 377 F.3d 119, 125 (1st Cir. 2004)); see also De Jesús Nazario v. Morris Rodríguez, 554 F.3d 196, 207 (1st Cir. 2009) (noting Supreme Court's rejection of the proposition that fee awards should be proportionate to the amount of damages recovered).

Indeed, section 9's explicit statement that the award of fees shall be made "irrespective of the amount in controversy" confirms the limited significance of a plaintiff's modest monetary success, including when the plaintiff had sought substantial

-29-

damages.  Mass. Gen. Laws ch. 151B, § 9; see also Olmstead v. Murphy, 489 N.E.2d 707, 709 (Mass. App. Ct. 1986) ("When the public . . . has a particular interest in the vindication of a legal right, the market value of legal services . . . should not be automatically discounted because that value is high in relation to the amount recovered."). Moreover, even "[t]he fact that . . . the suit did not confer broad benefits on the public[] should not result automatically in major restrictions on compensable hours." Stratos, 439 N.E.2d at 787.  At the same time, however, "compensable hours may be reduced if the time spent was wholly disproportionate to the interests at stake."  Id. at 786.

## B.  District Court's Rulings

The district court's rulings on attorney's fees are briefly described in the procedural background section of this opinion.  For the reader's convenience, we reprise that background here, with additional detail pertinent to our analysis.

### 1.  The Pre-Trial Ruling

In January 2011, in a written decision issued before the jury took up the question of compensatory damages, the district court ruled that it would award Joyce "reasonable attorney's fees" because she was a prevailing party. Joyce, 770 F. Supp. 2d at 427. The court rejected the defendants' argument that Joyce had not prevailed because they had changed the tournament rules before her suit was filed.  Although agreeing with the defendants that Joyce's

success was "very limited and pyrrhic in nature," the court held that she was entitled to fees based on its finding that she had been a victim of discrimination. Id. The court stated that "[n]o special circumstances which would foreclose the award of fees are readily apparent and the defendants do not raise any." Id.

The court emphasized, however, that it would link the amount of fees to the amount of compensatory damages to be awarded by the jury, "if any." Id. The judge explained that, "[i]f only nominal or limited damages are awarded, the reasonable fee will be correspondingly limited." Id.

## 2.  The Post-Trial Ruling

After the jury awarded Joyce $15,000 in compensatory damages, she sought reimbursement for $167,855 in attorney's fees and $4,993 in other costs. The Town objected on the ground that the amount sought was unreasonable and excessive, and it again asserted that special circumstances rendered any award of fees unjust. In arguing for a finding of special circumstances, the Town cited Joyce's last-minute notice of her desire to play in the May 2007 men's tournament and her failure to engage with the defendants about her concerns.[22]

---

[22] The defendants specifically noted Joyce's refusal to attend the GAC meetings at which her complaint was discussed and her failure to respond to either defense counsel's phone calls or the Town's settlement offer in February 2011.

Although the district court found the defendants' arguments "compelling," it concluded that Joyce was entitled to "modest attorney's fees . . . commensurate with the results she obtained and mitigated by the factors present in this case." Joyce, 802 F. Supp. 2d at 288. In its analysis, the court described the degree of success obtained as "[t]he 'most critical factor' in determining the reasonableness of a fee." Id. at 289 (quoting Farrar v. Hobby, 506 U.S. 103, 114 (1992)). It reiterated its view that Joyce had achieved limited results and stated that the lawsuit "could have easily been avoided or resolved well before trial." Id. at 290. The court deemed the results of the lawsuit "minimal" because the Town had changed its policy for 2008 before Joyce filed suit and because the court had "limited its summary judgment ruling to this case only." Id. Against this backdrop, the court concluded that "the requested fee of more than ten times the jury award is excessive and unreasonable." Id.

The court also criticized the plaintiff and her counsel for refusing the defendants' "reasonable" settlement offer of $35,001, which, in the court's view, "obviated the need for a jury trial[,] which alone accounted for 60 hours billed by plaintiff's counsel." Id. at 291.[23] The court invoked Federal Rule of Civil

_____

[23] The court stated that "the refusal by plaintiff's counsel to accept the settlement offer was unreasonable." Joyce, 802 F. Supp. 2d at 291. We do not understand this statement as an assertion that counsel made the settlement decision without consulting Joyce -- a violation of ethical rules, see Mass. R.

Procedure 68, which requires a plaintiff who recovers less at trial than was offered in a formal pre-trial settlement proposal to pay the opposing party's post-offer costs, see Fed. R. Civ. P. 68(d), and prevents shifting of post-offer attorney's fees and other costs, see Bogan v. City of Boston, 489 F.3d 417, 430 (1st Cir. 2007). The court noted that Rule 68 did not technically apply, but concluded that its purpose "to promote settlement and avoid the expense of trial" made it reasonable to award Joyce none of the costs or fees that accrued after the defendants' offer on February 4, 2011.[24] Joyce, 802 F. Supp. 2d at 291. The court observed that imposing on the defendants the full burden of this "avoidable litigation" would "encourage similarly situated plaintiffs to refuse all reasonable settlement offers and proceed to trial." Id. at 292.

The court also found that the number of hours claimed by plaintiff's counsel was excessive for the case as a whole and for

---

Prof. C. 1.2(a), 1.4 -- but we instead construe the court's unfortunate phrasing to reflect the view that counsel had advised Joyce against accepting the offer.

[24] It is undisputed that the defendants made a formal offer under Rule 68. The court presumably, and correctly, characterized the rule as inapplicable because, based on the ruling it was about to issue, Joyce would be recovering an amount well in excess of the $35,001 offer, which was inclusive of attorney's fees and costs. She was awarded a total of $49,600: $15,000 in compensatory damages, $30,000 in attorney's fees, and $4,600 in other costs. See Bogan, 489 F.3d at 431 (stating that the calculation under Rule 68 "includes only the jury award and the pre-offer fees and costs actually awarded by the court," not the amount requested).

particular tasks, and it speculated that "a significant portion of the hours enumerated relate to the bickering between counsel over media coverage." Id. In the court's view, many of the hours spent on the litigation were unjustified because the "case involved a relatively simple and straightforward fact pattern and . . . an uncomplicated legal theory." Id. at 291.

The court acknowledged that the defendants shared the blame for prolonging the case, noting that they had opposed summary judgment and failed to offer a formal settlement until just before the trial's start date. Nonetheless, the court placed most of the responsibility for the length of the proceedings on Joyce and her counsel:

> [T]he Court finds that a fair and reasonable solution is to reduce plaintiff's requested fee award substantially, taking into account not only the limited results obtained but also the fact that the plaintiff was largely responsible for the unnecessary protraction of this litigation. For the reasons already elucidated, the Court finds that the number of hours spent and the costs incurred by plaintiff's counsel were wholly unreasonable given the interests at stake and the benefit gained.

Id. The court thus concluded that there were "abundant reasons for substantially reducing the requested fees and expenses," and it determined that $30,000, plus $4,600 in costs, was a reasonable award. Id. at 292.

## C.  No Fees At All?

On appeal, the Town continues to insist that Joyce was not a prevailing party and that, even if we conclude otherwise, the statutory "special circumstances" qualifier applies to render an award of attorney's fees "unjust" in this case.  See Mass. Gen. Laws ch. 151B, § 9.  The Town again relies primarily on the fact that the tournament policy was changed consistently with Joyce's demands before the lawsuit was filed, rendering the litigation unnecessary and largely inconsequential.  It contends that Joyce insisted on proceeding with the case in the hope of obtaining "a financial windfall."

As an initial matter, we may not lightly disregard the district court's judgment that, despite its concerns about how the case was litigated, some award of fees was appropriate.  Indeed, Joyce succeeded on her primary claims,[25] and the litigation plainly produced results that inured to the benefit of Joyce and others.  In finding that the defendants discriminated against Joyce in violation of federal and state law, the court rejected multiple defenses offered by the defendants in an attempt to show that her claim was not remediable under either regime.  In rulings not challenged on appeal, it held that the tournament from which Joyce

---

[25] Neither the defendants nor the district court suggested that Joyce's fees should be limited because she prevailed on only some of her claims.  Most of the unsuccessful claims were against the individual defendants and dismissed on the basis of qualified immunity.

was excluded was a "place of public accommodation" under Massachusetts' law, see Mass. Gen. Laws ch. 272, § 92A, that plaintiffs do not bear the burden of proving a denial of "full and equal accommodations" to establish discrimination under the state public accommodations law, see id. § 98, and that "separate but equal" facilities do not satisfy that law. Moreover, the jury determined that Joyce suffered compensable harm as a consequence of the defendants' actions.

Joyce's litigation victory was thus neither "'purely technical [n]or de minimis,'" Coutin, 124 F.3d at 339 (quoting Farrar, 506 U.S. at 117 (O'Connor, J., concurring)).[26] Particularly given the statutory mandate that fees be awarded unless it would be "unjust" to do so, we agree with the district court that Joyce is entitled to a reasonable amount of attorney's fees. Whether the district court properly determined that fee is our next inquiry.

## D.  Calculating a Reasonable Fee

Joyce asserts that the court made two legal errors in awarding her only $30,000 of the nearly $170,000 in fees that she requested: (1) linking the amount of compensable fees to the amount of damages, and (2) factoring in her refusal to accept the Town's settlement offer. We agree that the court's reduction of the fee award based on those rationales was improper and, hence, an abuse

---

[26] Of course, even "obtaining only nominal damages does not negate the possibility of a fee award." Coutin, 124 F.3d at 339 n.6.

of the court's discretion.  See Coutin, 124 F.3d at 336 (stating that an abuse of discretion occurs, inter alia, "'when a material factor deserving significant weight is ignored [or] when an improper factor is relied upon'" (quoting Foster v. Mydas Assocs., Inc., 943 F.2d 139, 143 (1st Cir. 1991))).

The court began its discussion by describing at length the well established principle that a fees award should reflect the plaintiff's level of success, obliging the court to trim the base fee generated by the hours-times-rate calculation when the litigation has achieved only modest results.  The district court also recognized that the "results" of litigation embrace more than the amount of damages awarded by the jury.

The court's application of these principles, however, was flawed in multiple respects.  First, in assessing the benefits achieved by the litigation, the court emphasized the Town's pre-litigation change of policy and its own "limited" finding of unlawful discrimination that it had declared applicable to "this case only."  The court overlooked, however, the potential impact of its state-law rulings characterizing the golf tournament as a place of public accommodation, rejecting a "separate but equal" exception to the public accommodation law, and clarifying the plaintiff's burden of proof.  It thus appeared to treat the damages award as the only significant result obtained.  Indeed, it stated that, "[i]n accordance with the substantial body of case law cited

-37-

herein, the award of attorney's fees here will be correspondingly circumscribed by the jury award of damages." Joyce, 802 F. Supp. 2d at 290. This limited view of the litigation's impact was incorrect.

Relatedly, as the authorities described above make clear, even if Joyce's lawsuit had achieved nothing other than compensatory relief for her, it would have been an error of law for the district court to link the amount of recoverable attorney's fees solely to the amount of her damages. Fee-shifting provisions in general reflect a legislative judgment that "'the public as a whole has an interest in the vindication of the rights conferred by the statutes . . . over and above the value of a . . . remedy to a particular plaintiff.'" City of Riverside v. Rivera, 477 U.S. 561, 574 (1986) (quoting Hensley, 461 U.S. at 444 n.4 (Brennan, J., concurring in part and dissenting in part)). With respect to § 9 in particular, the Massachusetts Attorney General has stated that "an 'appropriate award of attorney's fees promotes Chapter 151B's policy of enlisting the help of private attorneys general in the fight against discrimination.'" Borne v. Haverhill Golf & Country Club, Inc., 791 N.E.2d 903, 917 n.17 (Mass. App. Ct. 2003) (quoting brief filed by Attorney General as intervenor); see also Stratos, 439 N.E.2d at 786 (noting the purpose of fee-shifting provision "to encourage suits that are not likely to pay for themselves, but are nevertheless desirable because they vindicate important rights").

The district court appeared to recognize that the amount of damages is only "one element in the constellation of factors" that must be considered in determining a reasonable fee. Coutin, 124 F.3d at 338. As we have described, the court discussed a number of reasons for its decision. Yet its pre-trial ruling on fees expressly stated that it would correlate the fee award to the jury's damages award: "If only nominal or limited damages are awarded, the reasonable fee will be correspondingly limited." Joyce, 770 F. Supp. 2d at 427. The court confirmed its intent to draw such a link in its post-trial ruling, noting that it previously had advised the plaintiff that "any award of attorney's fees would be proportionate to her recovery at trial." Joyce, 802 F. Supp. 2d at 291. Whether or not the district court ultimately relied exclusively on the amount of the damage award to calculate the appropriate fee, it is apparent that it gave too much weight to that element.

The other substantial problem with the court's calculation is that it unequivocally took into account Joyce's rejection of the settlement offer. Although the court recognized that Rule 68 did not apply because Joyce's total award (damages, costs, and attorney's fees) exceeded the Town's offer, it nonetheless repeatedly pointed to her refusal to settle. It observed that the settlement offer was reasonable, that the offer "obviated the need for a jury trial," and that the refusal to

accept the offer was unreasonable.  Id.  The court stated that, in keeping with "the principle" of Rule 68, it would be reasonable to award no costs or fees incurred after the offer was made on February 4, 2011.  Id.  Indeed, it deleted from Joyce's requested costs the expenses incurred after that date.  Finally, the court concluded its fees discussion by commenting that placing the full cost of the litigation on the defendants "would encourage similarly situated plaintiffs to refuse all reasonable settlement offers and proceed to trial instead."  Id. at 292.

We have held that "it is a mistake of law to reduce an award of attorneys' fees in a civil rights case in response to a plaintiff's rejection of a defendant's settlement offer when the subsequent judgment exceeds that offer."  Coutin, 124 F.3d at 341; see also id. (noting that the higher judgment amount "validates the appellant's rejection of the tendered settlement and immunizes her from detrimental consequences based upon that rejection").  It is plain that the district court committed such an error in this case and, hence, for that reason alone the fees must be recalculated. The court did not quantify the reduction it made on account of the rejected settlement, though it did not appear to entirely exclude payment for the post-offer fees.[27]  Hence, we cannot remedy this error by directing the court to add a specific amount or percentage

---

[27] The court reported that plaintiff's counsel invoiced $48,254 in attorney's fees after February 1, 2011.

-40-

to Joyce's fee award. Instead, the court should calculate a new award on remand that eliminates as a factor Joyce's refusal to settle, and also rectifies its undervaluation of Joyce's success and its over-emphasis on the amount of the damages award.

Moreover, the court should clearly and fully explain the basis for its recalculation. See id. at 337 ("[T]he order awarding fees, read against the backdrop of the record as a whole, must expose the district court's thought process and show the method and manner underlying its decisional calculus."). That recalibration will not necessarily produce a fees award at or near the amount of Joyce's request. The district court referred to a number of factors that it could properly consider in evaluating the reasonableness of the time expended. These include "a relatively simple and straightforward fact pattern and . . . an uncomplicated legal theory," Joyce, 802 F. Supp. 2d at 291, and the attendance of two experienced litigators throughout the damages trial (representing sixty hours of billable time).

We emphasize that we are not endorsing these factors as justifications for the court's substantial reduction of the fee request, but note them only as considerations the court properly could take into account. On the other hand, the court could not properly ignore the Town's vigorous defense of the case. Although the court recognized that the defendants bore some responsibility for the nature and length of the litigation, its incorrect focus on

the rejected settlement plainly colored its attitude toward the defendants' strategy. Not only did the defendants oppose summary judgment on multiple (unsuccessful) grounds and propose settlement at the last minute -- factors noted by the district court -- they also repeatedly argued against any award of attorney's fees for Joyce (including in a cross-appeal). In deciding whether, and how much, to adjust the baseline lodestar calculation, the court should not overlook Joyce's need to respond to such defense positions.

As we have observed, "the trial court is in the best position to gauge the bona fides of a request for fees." Spooner v. EEN, Inc., 644 F.3d 62, 70 (1st Cir. 2011). So long as the court relies on proper factors, and "offer[s] reasonably explicit findings . . . to spell out the whys and wherefores," Coutin, 124 F.3d at 337 (internal quotation marks omitted), we will not second-guess its judgment on the "time reasonably spent preparing and litigating [the] case," Fontaine, 613 N.E.2d at 891. Here, because the court's calculation incorporated multiple mistakes of law, we have no choice but to remand for reconsideration of a reasonable fee.

## V.

For the reasons stated, we find no error in the district court's denial of Joyce's request for a jury instruction on punitive damages. We vacate the denial of injunctive relief and the award of attorney's fees, and remand both of those issues to

the district court for further proceedings consistent with this opinion.

So ordered.   Costs to appellant.